# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAFAYETTE DIVISION

| | | |
|---|---|---|
| **WILLIE TAYLOR, JR.** | * | **CIVIL ACTION NO. 14-2563** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE WHITEHURST** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993.  Willie Taylor, Jr., born May 2, 1959,[1] filed applications for a period of disability, disability insurance benefits and supplemental security income payments on January 5, 2012, alleging disability as of January 3, 2012, due to back pain, lack of focus, anxiety, depression, and inability to bend or stoop.  After denial of the applications, claimant requested a hearing, which was held on May 15, 2013.  (Tr. 24-51).  Claimant was represented by attorney Chuck D. Granger at the hearing.

On July 15, 2013, the Administrative Law Judge ("ALJ") issued a Decision denying the applications.  (Tr. 7-19).  Following the Appeals Council's denial of claimant's request for review on July 7, 2014 (Tr. 1-3), claimant, proceeding *pro se*, filed an action for judicial review with this Court on August 22, 2014 [rec. doc. 1].

---

[1]Plaintiff asserts that he is considered a "person of advanced age" for purposes of the Social Security Regulations.  [rec. doc. 11, p. 3].  However, at the time of the ALJ's decision, claimant was considered a "[p]erson closely approaching advanced age (age 50-54)," 20 C.F.R. § 404.1563(d), not a "[p]erson of advanced age (age 55 or older)," 20 C.F.R. § 404.1563(e), under the regulations.

On March 9, 2015, claimant, through his new attorney, Joseph R. Oelkers, III, filed his brief.  [rec. doc. 11].  Defendant, U.S. Commissioner Social Security Administration ("Commissioner"), filed opposition on April 23, 2015.  [rec. doc. 12].  Claimant filed a reply on May 4, 2015.  [rec. doc. 13].

## I. STANDARD OF REVIEW

The Court limits its review of a denial of disability insurance benefits to two issues: (1) whether the Secretary applied the proper legal standards, and (2) whether the Secretary's decision is supported by substantial evidence on the record as a whole.  *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Wingo v. Bowen*, 852 F.2d 827, 829 (5th Cir. 1988).

The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive.  *Richardson v. Perales*, 402 U.S. 389, 390, 91 S.Ct. 1420, 1422, 28 L.Ed.2d 842 (1971).  Substantial evidence is defined as more than a mere scintilla.  *Id*., 402 U.S. at 401, 91 S.Ct. at 1427.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id*.

The Court may not, however, reweigh the evidence or substitute its judgment for that of the administrative fact finder.  *Cook v. Heckler*, 750 F.2d 391, 392-93 (5th Cir. 1985).  If substantial evidence supports the administrative finding, the Court may then only review whether the administrative law judge applied the proper legal standards and conducted the proceedings in conformity with the applicable statutes and regulations.  *Id*.

## II. BURDEN OF PROOF

Disability is defined as " inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be

2

expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 416(i)(1), 423(d)(1)(A).  The existence of such disability must be demonstrated by medically acceptable clinical and laboratory diagnostic findings, and the overall burden of proof rests upon the claimant.  *Cook,* 750 F.2d at 393.

The Commissioner uses a sequential, five-step approach to determine whether a claimant is so disabled.  *Ramirez v. Colvin*, 606 F. App'x 775, 778 (5th Cir. 2015).  The steps include: (1) whether the claimant is presently performing substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from doing past relevant work; and (5) whether the impairment prevents the claimant from performing any other substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The burden of proof is on the claimant at the first four steps.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  The burden of proof shifts to the Commissioner at the fifth step to establish the existence of other available substantial gainful employment that a claimant can perform.  *Fraga v. Bowen*, 810 F.2d 1296, 1301-02 (5th Cir. 1987).  If the Commissioner identifies such employment, the burden shifts back to the claimant to prove that he could not perform the alternative work identified.  *Id*. at 1302.  Throughout the process, the ultimate burden of establishing disability remains with the claimant.  *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983).

## III. ANALYSIS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support

3

the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards.  *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

### A. Medical Evidence

Claimant complains of back pain, lack of focus, anxiety, depression, and inability to bend or stoop.  Regarding his mental impairments, claimant presented at Jefferson Parish Human Services Authority in January, 2011 with complaints of depression, irritability, low energy, low motivation, crying spells, increased appetite, poor sleep, pacing, inability to focus, nightmares and flashbacks.  (Tr. 235).  He had a history of using alcohol and marijuana/hashish, which he had last used in 2006.  (Tr. 278-79).  His diagnosis was major depressive disorder, recurrent, and post-traumatic stress disorder.  (Tr. 239).

Claimant quit treatment on March 10, 2011, because he felt better.  (Tr. 242).  On January 18, 2012, he returned with complaints of feeling down after being laid off of work, having nightmares again, feeling anxious, and panicking when he heard police cars.  He improved on medications, and had a recurrence of symptoms when off of them.  He was prescribed Celexa and Hydroxyzine.

On May 14, 2012, state agency psychologist Lisette P. Constantin, Ph.D., completed a Psychiatric Review Technique ("PRT"), in which she assessed claimant under the listings for affective disorders (12.04), anxiety-related disorders (12.06), and personality disorders (12.08).  (Tr. 45).  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06, 12.08  She found that claimant

had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning and concentration, persistence or pace, and no episodes of decompensation.

In the Mental Residual Functional Capacity ("RFC") Assessment, Dr. Constantin found that claimant had no understanding and memory limitations, and no sustained concentration and persistence limitations.  (Tr. 60).  She found that his ability to interact with the general public and accept instructions and respond appropriately to criticism from supervisors was moderately limited, and that his ability to ask simple questions or request assistance, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness was not significantly limited.

On May 14, 2012, David Greenway, Ph.D., performed a consultative psychological examination.  (Tr. 309).  He considered the information provided to be of poor reliability.  He stated that there was "robust exaggeration of symptoms" and "poor effort during testing."  Administration of a feigning tests revealed positive results.  He believed the findings to be a "minimally reliable and valid estimate of his current functional status."

Claimant reported that he had been arrested by the police on numerous occasions, including for battery against a police officer and a domestic partner, endangering a child, armed robbery, simple robbery and disturbing the peace.  (Tr. 310).  His most recent incarceration was for seven months in 2010.  He admitted to a history of polysubstance abuse, and still drank sometimes.

Regarding complaints, claimant reported that he was "scared by" police, and could not leave his house "without being reminded of what they did to me," and could not leave his house

and "go to no job."  He brought in prescriptions for Hydrocodone and Ibuprofen for back pain, but said that he "don't get nothing no more."  He was unemployed and not looking for work.  He shopped for himself, cooked simple meals, and did some household chores.  He denied any social activities.

On mental status exam, claimant had no indication of psychotic symptoms.  His verbal behavior was of normal rate and volume.  His speech was relatively capable of adequately conveying ideas, without loosening of associations.  He had no evidence of a formal thought disorder.

Claimant's vocabulary and range of expressive symbols were good.  He displayed no difficulty in enunciation or production of speech.  His receptive skills were good.

Affective expression was composed.  Insight and judgment were limited.  Claimant's attitude toward testing was poor, and he was confrontational during the evaluation.  (Tr. 310-11).  His social skills were simple, but adequate.  (Tr. 311).

During interviewing, claimant was alert and oriented to person, but not place, time, or situation.  Recent and remote memories appeared intact.  Behavioral pace was slow with spotty effort.  Response latency was normal.  Intelligence was estimated in the low average range of intellectual functioning.

Dr. Greenway's impression was malingering, polysubstance abuse (in remission), anti-social personality disorder, and psychosocial problems.  Claimant's Global Assessment of Functioning ("GAF") score was 65 for the past year.

In conclusion, Dr. Greenway found no indication of daily impairment due to significantly deteriorated mental health.  He found that claimant should be able to maintain competitive

employment.  He determined that claimant should be able to understand, remember and carry out relatively detailed instructions; maintain attention to perform simple repetitive tasks for two-hour blocks of time; tolerate normal work-related stress, and sustain effort and persist at a normal pace over the course of a routine 40-hour workweek.  His social skills were adequate, and he should be able to relate to others in employment settings.

Dr. Greenway certified that he "personally conducted, or personally participated in conducting, the consultative examination."  (Tr. 312).

On April 24, 2012, claimant was referred to Dr. Joseph Henry Mental Health Center for nightmares and depression.  (Tr. 351).  He had a history of PTSD after being beaten by police two years prior.  He denied current or past alcohol or illegal drug use.[2]  (Tr. 354). His only medication was Ibuprofen.  (Tr. 353).

Claimant's diagnosis was major depression and PTSD.  (Tr. 356).  His GAF score was 50.

Claimant attended therapy sessions with Debra J. Nilson, LCSW, on May 24, 2012, and June 21, 2012.  (Tr. 349-50).  He reported that he wanted to get back to work but was "not able to get employment after being incarcerated."[3]  (Tr. 350).  He was prescribed Celexa, Trazadone and Vistaril.  (Tr. 348).

On February 20, 2013, Dr. Patrice Ambrose wrote a letter to claimant's attorney indicating that claimant was a patient at the Tyler Mental Health Center, and that his diagnosis

---

[2]This conflicts with the records from Jefferson Parish Human Services Authority and Dr. Greenway in which claimant admitted past alcohol and drug use.  (Tr. 278-79, 310).

[3]This conflicts with claimant's report to Dr. Greenway that he could not leave his house and go to a job. (Tr. 310).

was major depressive disorder, severe with anxiety.  (Tr. 230).  She stated that his current medications included Celexa, Trazadone and Vistaril.  She concluded that claimant was "unable to sustain any type of gainful employment."

As to his physical impairments, claimant presented at Interim Louisiana State University Public hospital on July 14, 2011, with complaints of severe back pain.  (Tr. 328).  An MRI dated October 5, 2011 showed lumbar spondylosis, without acute abnormality, and small bilateral disc-osteophyte complex at L5-S1.  (Tr. 232).  Dr. Vonder McNeil's diagnosis was arthritis.  (Tr. 324).

Claimant underwent a consultative examination with Dr. Miljana Mandich on April 27, 2012.  (Tr. 301).  At that time, claimant's major complaints were high blood pressure, right wrist problems, chest pains, and anxiety and depression.  He reported that he had high blood pressure, but had never been treated for it, and very brief episodes of sharp chest pains over the previous couple of years.

Additionally, claimant complained of intermittent low back pain for a while.  He reported that he had been involved in five or six car accidents in the 90s resulting in some neck and back injuries.  He also stated that he was beaten by the police in 2010, and still had trouble with his right wrist because of being handcuffed for a long period of time at the time of arrest.  He had taken Ibuprofen as needed until three months prior.

Claimant reported that he had lost 11 pounds during the previous year because of stress and worrying.  (Tr. 302).  He did not sleep well sometimes, and felt tired and nervous.  He stated that he had had some outpatient treatment for anxiety and depression after the arrest in 2010.  He complained that he often felt lightheaded, and thought it could be his blood pressure.

On examination, claimant was 72 inches tall and weighed 239 pounds.  His blood pressure was 172/120 initially, and 150/100 before leaving the office.  Chest and cardiovascular exams were normal.  (Tr. 303).

On spine and back exam, claimant ambulated without self-support getting on and off the chair and exam table.  He had normal gait and station, and normal range of motion of the neck.  He guarded the lower back, limiting forward flexion to about 70 degrees because of pain complaints.  He had normal extension and lateral flexion bilaterally, could walk on heels and toes and squat 2/3 of the way down and rise without support.  The straight leg raise test was negative bilaterally.

On extremities exam, claimant had no edema, color changes, visible abnormalities or swelling of any joint.  He repeatedly told Dr. Mandich that his right wrist was "swollen," and that he dropped objects because of pain over the dorsum of the wrist with lifting and carrying objects. Dr. Mandich carefully measured claimant's extremities, which revealed symmetrical circumferences of his upper arms, distal forearms, wrists and hands.  Claimant's forearm was 1/4" more in circumference than the left, which was normal for a right-handed individual.  (Tr. 304).  He had normal range of motion of all joints, including the right hand.

Neurologically, claimant's cranial nerves were intact.  He had normal grip strength, grasping, and dexterity bilaterally.   Sensation was intact, and he had no abnormalities of coordination or involuntary movements.  Superficial reflexes were intact.  Claimant had 1+ deep tendon reflexes and normal gait.

Mentally, claimant appeared to be of low average intelligence.  He was somewhat slow moving, reluctant in responding to questions and commands, and appeared very guarded.  He

9

exhibited adequate understanding, cooperation, concentration, attention, and memory.

EPA and lateral chest views showed no evidence of active pulmonary or cardiac pathology.  (Tr. 300, 304).  EKG was normal.  (Tr. 299, 304).

Dr. Mandich's diagnoses were hypertension with prior history, but never treated; anxiety and depression without psychotic features; atypical chest pains and shortness of breath associated with anxiety and sometimes with heavy physical activities such as lifting and stooping, relieved with rest within a few seconds and not suggestive of angina; right wrist pain with no positive physical findings, and recurrent non-radiating low backaches.

Dr. Mandich advised claimant to seek treatment for hypertension.  He noted that the rest of his physical exam was completely unremarkable, except that he had mildly limited forward flexion in the thoracolumbar region because of back pain that he localized across the back at waist level.  He also found that the extremities were normal, and neurological exam was intact. He recommended that claimant seek medical attention for any future chest pains.

On October 22, 2012, claimant presented at Our Lady of Lourdes Regional Medical Center with complaints of chronic lumbar pain radiating down to his left knee.  (Tr. 337).  Back, musculoskeletal and neurological examinations revealed no objective findings.  (Tr. 338). Lumbar spine x-rays showed no acute findings.  (Tr. 335).  The diagnosis was back pain, for which he was prescribed Lortab, Flexeril and Toradol.  (Tr. 340).

## B. Hearing Testimony

At the hearing on May 15, 2013, claimant was 54 years old.  (Tr. 27).  He had completed the 10th grade.[4]  He had last worked on December 11, 2011, as a laborer.  (Tr. 27-28).

---

[4]Claimant completed his GED while incarcerated.  (Tr. 62, 309).

Claimant testified that he had quit working because of depression.  (Tr. 28).  He stated that he had gotten out of jail in 2010 after serving seven months for battering a woman and her child.  He reported that he had been beaten by police, and went into a panic state every time he saw a police officer or heard sirens.  (Tr. 30, 32).  Previously, he had been incarcerated for armed robbery.  (Tr. 28).

Claimant reported that he was disabled because he could not keep a job.  (Tr. 29).  He complained that his doctor put him on medication to help him cope, but it did not help him get a job.

Prior to his arrest in 2010, claimant worked as a heavy equipment operator.  (Tr. 31).  After getting out of jail, he returned to work for the same company.  However, he was terminated because it was a government job, and he had a record.  (Tr. 32).

Claimant said that because the police continued to harass him, he left New Orleans and moved to Opelousas.  He said that he had applied for work at a few places, but was not hired because of his criminal record.

Regarding his complaints, claimant testified that when he was depressed, he had no desire to do anything.  (Tr. 32).  He reported that he was taking medication for depression and stress, which helped, but made him drowsy.  (Tr. 33, 34).  He stated that he saw Dr. Ambrose at Tyler Mental Health almost every month.  (Tr. 33).

## C. Argument

Claimant argues that: (1) the ALJ erred at step 2 in improperly determining that claimant's mental impairments, affective anxiety and personality disorders, were not severe by violating the attending physician's rule; (2) the ALJ erroneously applied the disabling pain

11

standard only to claimant's orthopedic impairment, degenerative disc disease, and (3) the ALJ improperly applied the Medical-Vocational Guidelines ("Grids") to improperly deny benefits at step 5 of the sequential evaluation process.

First, claimant argues that the ALJ erred in improperly determining that his mental impairments were not severe by violating the treating physician rule.  Specifically, he argues that the ALJ erred in granting "little weight" to the opinion of the treating psychiatrist, Dr. Ambrose, while granting "great weight" to the report of the one-time examining psychologist, Dr. Greenway.  [rec. doc. 11, p. 4].

The ALJ found that claimant's mental impairments of affective disorder, anxiety disorder, and personality disorder, considered singly and in combination, did not cause more than minimal limitation in claimant's ability to perform basic mental work activities and were, therefore, nonsevere.  (Tr. 13).  He observed that claimant was noncompliant with medication and did not follow up with mental health appointments, which is confirmed by the medical records.  (Tr. 242, 310, 353).  It is well established that failure to follow prescribed medical treatment precludes an award of benefits.  20 C.F.R. § 416.930(a), (b); *Johnson v. Sullivan*, 894 F.2d 683, 685, n. 4 (5th Cir. 1990).

The ALJ also gave "great weight" to the opinion of the state agency psychologist, Dr. Constantin, regarding claimant's activities of daily living and maintaining concentration, persistence and pace, as these findings were consistent with the record.  (Tr. 14).  However, he gave "little weight" to Dr. Constantin's opinion regarding social functioning, because the record showed that when claimant was compliant with medication, he functioned normally.  (Tr. 242). If an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it

cannot serve as a basis for a finding of disability.  *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir.

1988); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).

Regarding the opinion of the consultative psychologist, the ALJ observed that Dr.

Greenway diagnosed claimant with malingering, and noted the evaluation results were invalid.

(Tr. 14, 309).  The ALJ also noted that due to inconsistencies in presentation and poor effort in

testing by claimant, Dr. Greenway administered a test of feigning with positive results.  He

further considered Dr. Greenway's finding that claimant had no indication of daily impairment

due to significantly deteriorated mental health.

The ALJ noted that, more particularly, Dr. Greenway determined that claimant was able

to maintain competitive employment because he could understand, remember and carry out

relatively detailed instructions; maintain attention to perform simple, repetitive tasks for two-

hour blocks of time; tolerate normal work-related stress; sustain effort and persist at a normal

pace over the course of a routine 40-hour workweek, his social skills were adequate, and he

should be able to relate to others in employment settings.  (Tr. 311).  He gave Dr. Greenway's

opinion "great weight," as it was consistent with the ALJ's "impression of the claimant at the

hearing," and the record did not support a severe mental impairment.  It is well-established that

the ALJ's credibility determination is entitled to great deference.  *Newton v. Apfel*, 209 F.3d 448,

458 (5th Cir. 2000).

Additionally, claimant argues that the ALJ erred in giving greater weight to the opinion of

Dr. Greenway, who is a consultative psychologist, than the opinion of his treating physician, Dr.

Ambrose, who is a psychiatrist.  [rec. doc. 11, p. 4].  The Social Security Regulations provide

that: "[w]e generally give more weight to the opinion of a specialist about medical issues related

13

to his or her area of specialty than to the opinion of a source who is not a specialist.  20 C.F.R. § 404.1527(c)(5).  However, psychologists and psychiatrists are both considered specialists in mental health issues under the regulations.  *See Addison v. Soc. Sec. Admin.*, 2015 WL 4635456, at *6 (E.D. La. Aug. 3, 2015) (*quoting* 20 C.F.R. § 404.1527(f)(2)(I) (2012); SSR 96-6p, 1996 WL 374180 at * 2) ("[s]tate agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation"); *Nelson v. Astrue*, 2013 WL 372924, at *6 (N.D. Tex. Jan. 16, 2013), *report and recommendation adopted*, 2013 WL 373440 (N.D. Tex. Jan. 31, 2013) (*citing* 20 C.F.R. §§ 404.1527(c)(5), 420.927(c)(5)) ("[t]he ALJ was entitled to give more weight to the opinions of the psychologist and psychiatrists about Nelson's mental impairment than to the opinions of primary care and internal medicine physicians, who are not specialists in mental health issues.").  Thus, this issue lacks merit.

Additionally, the ALJ gave good cause for rejecting Dr. Ambrose's opinion.  It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability.  *Newton*, 209 F.3d at 455; *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).  A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with  . . .  other substantial evidence."  *Newton*, 209 F.3d at 455.

Good cause for abandoning the treating physician rule includes disregarding statements by the treating physician that are brief and conclusory, not supported by medically accepted

14

clinical laboratory diagnostic techniques, or otherwise unsupported by evidence.  *Id*. at 456; *Greenspan*, 38 F.3d at 237.

Here, the ALJ gave "little weight" to Dr. Ambrose's opinion that claimant could not sustain gainful employment due to major depressive disease and anxiety disorder.  (Tr. 14). First, he noted that claimant had never under undergone intensive, extended inpatient treatment. He emphasized that claimant responded well to medication when he took it.  (Tr. 242).  He also noted that although Dr. Ambrose's assessment seemed dire, Dr. Ambrose did not recommend measures associated with the alleged severe disabling mental distress.  (Tr. 14).

Second, the ALJ noted that claimant was responsive to treatment, and had refilled his prescriptions.  (Tr. 242, 348).  Third, he observed that no other treating physician or clinicians had found claimant disabled.  *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995); *Harper v. Sullivan*, 887 F.2d 92, 97 (5th Cir. 1989) (substantial evidence supported ALJ's finding that claimant's subjective symptomology not credible when no physician on record stated that claimant was physically disabled).

Fourth, the ALJ noted that Dr. Ambrose had relied on claimant's subjective complaints, at least partially, to render his medical source statement.  He observed that Dr. Ambrose "uncritically accepted as true" most, if not all, of claimant's reports; however, good reason existed for questioning the reliability of his complaints.  *See Steen v. Commissioner of Social Sec.*, 2009 WL 1873518 (N.D. Miss. June 30, 2009) (opinion affirmed where ALJ afforded psychological report significant weight but the opinion was not controlling, because it was based on applicant's subjective complaints that were not supported by medical evidence); *Addison*, 2015 WL 4635456, at *6 (*citing Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991) ("[i]t is

appropriate for an ALJ to discredit a claimant's subjective complaints due to contradictory medical reports").

Fifth, the ALJ found that Dr. Ambrose did not reveal significant or diagnostic abnormalities one would expect if the claimant were in fact disabled, and Dr. Ambrose did not address this weakness.  (Tr. 15).  Sixth, the ALJ noted that the "possibility always exists that a treating source is possibly sympathetic to the claimant."  While he acknowledged that it was difficult to confirm this motive, he observed that it was "more likely in situations where the opinion in question departs substantially from the rest of the evidence in the record, as in this case." *See Sullivan v. Commissioner of Social. Sec. Admin*., 353 F. App'x. 394, *1 (11th Cir. 2009) (substantial evidence supported conclusion that ALJ discounted treating physician's opinion for good cause where one of the major reasons ALJ gave treating physician's assessment little evidentiary weight was because she was "clearly sympathetic" to claimant).[5]

Finally, the ALJ opined that it was unclear whether Dr. Ambrose was familiar with the terms in the Social Security Regulations.  *See Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) ("[a]mong the opinions by treating doctors that have no special significance are determinations that an applicant is 'disabled' or 'unable to work.'  20 C.F.R. § (3)(1).  These determinations are legal conclusions that the regulation describes as 'reserved to the Commissioner.'").  In conclusion, the ALJ found Dr. Ambrose's opinion inconsistent with the record and the results of her own treatment records, and gave her opinion little weight.

---

[5] *See contra Edwards v. Sullivan*, 985 F.2d 334, 337 (7th Cir. 1993) ("there is no presumption of bias in the treating physician's opinion. Rather, the ALJ has the ability, as the trier of fact, to consider the physician's possible bias"); *Oshkeshequoam v. Barnhart*, 274 F. Supp. 2d 985, 999 (C.D. Ill. 2003) (ALJ cannot presume bias on the part of a treating physician; any claim of bias must be substantiated through evidence in the record).

*See Greenspan*, 38 F.3d at 237; 20 C.F.R. § 404.1527(c)(4) ("[g]enerally, the more consistent an

opinion is with the record as a whole, the more weight we will give to that opinion.").

Although an ALJ has sole responsibility for determining a claimant's disability status, he

is free to reject the opinion of any physician when the evidence supports a contrary conclusion.

*Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990); *Bradley v. Bowen*, 809 F.2d 1054, 1057

(5th Cir. 1987).  When a physician's opinion is conclusory, unsupported by medically acceptable

clinical, laboratory or diagnostic techniques, or otherwise unsupported by the evidence, there

may exist good cause for an ALJ to discount the weight of evidence of the treating or examining

physician relative to other evidence.  *Newton*, 209 F.3d at 456.

Here, the ALJ has shown good cause for rejecting the opinion of Dr. Ambrose.  As Dr.

Ambrose's opinion was conclusory and unsupported by medically acceptable clinical, laboratory,

or diagnostic techniques, and inconsistent with the record as a whole, the ALJ had good cause to

discount her opinion.  Thus, his finding is entitled to deference.

Next, claimant argues that this matter should be reversed because he was examined by an

assistant, rather than Dr. Greenway.  [rec. doc. 11, p. 5].  He asserts that he filed objections;

however, the ALJ responded "*sub silencio*."

The hearing colliquy between the ALJ and claimant's attorney regarding Dr. Greenway

was as follows:

ALJ:    [W]e need to put in evidence 1A through the end.  Any objection?

ATTY: No, Your Honor, other than Dr. Greenway, Your Honor.  Because my
          client stated that he did not see Dr. Greenway.  He saw some assistant, and
          based on a report that I saw it – it's hard for me to fathom that you don't

see the doctor, and then the doctor says you are faking, and all this other
stuff when he stayed in there 10 minutes with an assistant.

ALJ:    I'll give you 10 days to file a written objection.

ATTY: All right.

ALJ:    Okay.

(Tr. 26).

In his report, Dr. Greenway certified, "under penalty of perjury," that he "personally
conducted, or personally participated in conducting, the consultative examination."  (Tr. 312).
There is no evidence, other than claimant's unsupported allegation, that Dr. Greenway did not
personally conduct or personally participate in claimant's examination.  While claimant filed a
letter objecting to the introduction of Dr. Greenway's report, he did not request to subpoena Dr.
Greenway or to cross-examine him.  (Tr. 227-28).

Claimant contends that he had a "due process right" to examine the "unnamed assistant,"
citing *Tanner v. Sullivan*, 932 F.2d 1110 (5th Cir. 1991), and *Lidy v. Sullivan*, 911 F.2d 1075 (5th
Cir. 1990).  [rec. doc. 11, p. 5].

In *Tanner*, the claimant's attorney expressly objected to the phrasing of post-hearing
interrogatories posed by the ALJ to the vocational expert.  The court held that by denying
counsel's objection *sub silentio*, he deprived the attorney of the opportunity to assert claimant's
right of cross-examination.  932 F.2d at 1113.  Here, however, claimant did not submit post-
hearing interrogatories or request to cross-examine Dr. Greenway and/or his "assistant."  Thus,
*Tanner* is inapplicable.

18

*Lidy* held that "by *requesting a subpoena*, a claimant has the right to cross-examine an examining physician." (emphasis added). *Id*. at 1077; *see also* AR 91-1(5) (when a claimant requests, prior to the closing of the record, that a subpoena be issued for the purpose of cross-examining an examining physician, the adjudicator must issue the subpoena). Due process requires that a claimant be given the opportunity to cross-examine and subpoena the individuals who submit reports. *Id*. (*citing Coffin v. Sullivan*, 895 F.2d 1206, 1212 (8th Cir.1990)). An opportunity for cross-examination is an element of fundamental fairness of the hearing to which a claimant is entitled. *Id*. (*citing Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420, 1428, 28 L.Ed.2d 842 (1971); *Wallace v. Bowen*, 869 F.2d 187, 192 (3rd Cir. 1989)).

Here, claimant did not request a subpoena, or to cross-examine Dr. Greenway or his assistant. Claimant was represented by a lawyer, an individual who is presumed to know about the right of cross-examination. *Coffin*, 895 F.2d at 1212. The ALJ, therefore, was not required to list and explain every option available to the attorney in order to meet due process requirements. *Id*. Thus, no due process violation occurred.

Next, claimant argues that the ALJ erroneously applied the "disabling pain standard" only to claimant's degenerative disc disease, citing the following portions of the Decision:

> Although the claimant has received treatment for chronic back pain, that treatment has been conservative and routine. The claimant alleges to be in extreme constant pain, the claimant just has not received the type of medical treatment that one would expect for a totally disabled person, such as intensive physical therapy, epidural steroid injections, and surgeries. This undermines the claimant's credibility that he is in extreme pain and incapable of performing any work. (Tr. 18).

and

[T]he undersigned cannot find the claimant's allegations that he is incapable of all work activity to be credible because of inconsistencies in the record as a whole. (Tr. 17).

To prove disability resulting from pain, an individual must establish a medically determinable impairment that is capable of producing pain. *Ripley v. Chater*, 67 F.3d 552, 556 (5th Cir. 1995). Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity. *Id.* Disabling pain must be constant, unremitting, wholly unresponsive to therapeutic treatment, and corroborated in part by *objective* medical testimony. (emphasis added). *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991).

Claimant contends that his pain, although not "consistent, unremitting, and wholly unresponsive to therapeutic treatments" and, therefore, not independently disabling, may still be considered a nonexertional limitation on the range of jobs open to him at step 5. [rec. doc. 11, p. 7]. He argues that this pain contradicts the ALJ's finding that he retained the residual functional capacity to perform the full range of medium work.

In finding that claimant's pain complaints were not fully credible, the ALJ relied on the lack of objective findings, claimant's noncompliance with treatment, and his daily activities. (Tr. 17-18).

Regarding the medical records, the ALJ cited the lumbar MRI revealing lumbar spondylosis without acute abnormality and a small bilateral disc-osteophyte complex at L5-S1, and the lumbar spine x-rays showing no abnormalities. (Tr. 232, 335). Additionally, he cited Dr. Mandich's report indicating that claimant had a normal EKG, a history of untreated hypertension,

atypical chest pains, right wrist pain with no physical findings, and recurrent radiating low back pain.  (Tr. 304).  Dr. Mandich opined that claimant should seek treatment for hypertension, but that the rest of claimant's physical exam was unremarkable.

It is well established that subjective complaints must be corroborated by objective medical evidence.  *Chambliss*, 269 F.3d at 522 (*citing Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir.1989)).  Here, claimant's complaints of pain are not supported by the objective medical evidence.  As the ALJ's determination as to claimant's physical impairments is supported by the record, it is entitled to considerable deference.

Claimant also argues that Dr. Mandich's report is incomplete, because he did not complete or attach the required opinion regarding claimant's ability, despite impairments, to perform work-related activity, such as sitting, standing, walking, lifting, carrying and handling objects.  [rec. doc. 11, p. 7].  Additionally, he asserts that the state agency consultants did not re-contact Dr. Mandich to request that he comply with the consultative reporting requirements. However, the regulations expressly provide that the absence of such a statement in a consultative examination report will not make the report incomplete. 20 C.F.R. § 404.1519n(c)(6); 416.919n(c)(6).  Thus, this argument lacks merit.

Additionally, a review of the report reflects that Dr. Mandich performed a complete examination of claimant.  (Tr. 301-05).  Dr. Mandich found that claimant's physical exam was completely unremarkable, except that he had mildly limited forward flexion in the thoracolumbar region because of back pain.  (Tr. 304).  However, claimant's extremities were normal, his neurological exam was intact, and x-rays were normal.  Because the record contained ample objective and opinion evidence supporting the ALJ's conclusions, he was not required to develop

the record further by re-contacting Dr. Mandich.  *Jones v. Astrue*, 691 F.3d 730, 733 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 953, 184 L. Ed. 2d 728 (2013).

Regarding claimant's noncompliance, the record is replete with evidence that claimant failed to take his medication as prescribed and follow-up with treatment recommendations.  (Tr. 242, 310, 353).  As stated above, failure to follow prescribed medical treatment precludes an award of benefits.  20 C.F.R. § 416.930(a), (b); *Johnson*, 894 F.2d at 685 n. 4.

Further, the ALJ noted that in the Adult Function Report, claimant indicated that he went outside every day, drove a car, rode in a car, bathed and groomed himself, counted change, watched television, went to church regularly, and spent time with his sister and wife daily.  (Tr. 190-93).  It is appropriate to consider the claimant's daily activities when deciding the claimant's disability status.  *Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995).  Accordingly, the ALJ's decision as to claimant's disability status is entitled to deference.

Finally, claimant contends that the ALJ improperly applied the Grids to deny benefits at step 5.  [rec. doc. 11, p. 9].  Specifically, he argues that the ALJ's finding that claimant could perform the full range of medium work was contrary to the evidence, and that he should have obtained expert vocational testimony.

In the Decision, the ALJ found claimant credible to the extent that he would experience back pain with very heavy lifting.  (Tr. 17).  Therefore, he reduced claimant's residual functional capacity to accommodate these limitations.  Moreover, he determined that although claimant's allegations were not fully consistent with the record, he gave claimant the benefits of the doubt. However, he could not find claimant's allegations that he was incapable of all work activity to be credible because of inconsistencies in the record.

22

The ALJ observed that although claimant had received treatment from chronic back pain, that treatment had been conservative and routine.  (Tr. 18).  He noted that while claimant alleged to be in extreme, constant pain, he had not received the type of treatment expected for a totally disabled person.  He also relied on the fact that claimant failed to follow up on his treating doctor's recommendations, which suggested that his impairment was not as severe as alleged.

Finally, the ALJ noted that claimant showed none of the general indices of people who suffer from chronic pain.  It is well established that the absence of objective factors indicating the existence of severe pain -- such as limitations in the range of motion, muscular atrophy, or impairment of general nutrition, can justify the ALJ's conclusion.  *Hollis v. Bowen*, 837 F.2d 1378, 1384 (5th Cir. 1988).  Giving claimant every consideration, the ALJ found that due to degenerative disk disease of the lumbar spine, claimant retained the ability to perform medium work.  As the ALJ's finding regarding claimant's ability to perform medium work is supported by the medical evidence, it is entitled to deference.

Claimant argues that once the ALJ disclosed that he consulted the Grids as a framework, he  was required to use vocational expert testimony.  [rec. doc. 11, p. 10].  However, the regulations provide that the ALJ may rely *exclusively* on the Guidelines in determining whether there is other work available that the claimant can perform when the characteristics of the claimant correspond to criteria in the Medical-Vocational Guidelines of the regulations, and that claimant either suffers only from exertional impairments or her nonexertional impairments do not significantly affect [his] residual functional capacity.  (emphasis added).  *Newton*, 209 F.3d at 458; *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  Where it is clear that the additional nonexertional limitation(s) has very little effect on the exertional occupational base, the ALJ may

23

properly rely on the framework of the Guidelines to support a finding that the person is not disabled without consulting a vocational expert or other vocational resource.  SSR 83-14; *see also* SSR 83-12 (guidelines may be applied where "the restriction will be so slight that it would clearly have little effect on the occupational base").

Here, the ALJ found that claimant either suffered only from exertional impairments or his nonexertional impairments did not significantly affect his residual functional capacity.  He relied on Rule 203.22, which directs a finding of not disabled for a claimant who is closely approaching advanced age, is a high school graduate or more, and who has skilled or semi-skilled work experience.  (Tr. 19) (*citing* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 203.22).  As this finding is supported by the evidence, it is entitled to deference.

### IV. CONCLUSION

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING**

**THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed this 30th day of December, 2015, at Lafayette, Louisiana.

_____
**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**

25